ARKANSAS KRAFT CORPORATION *v.*
Kathy JOHNSON, Administratrix of the Estate of
Ben JOHNSON

74-210                                    519 S.W. 2d 74

Opinion delivered February 24, 1975

*Laser, Sharp, Haley, Young & Boswell, P.A.,* for appellant.

*Smith, Williams, Friday, Eldredge & Clark,* by: *William H. Sutton* and *Frederick S. Ursery,* for appellee.

CARLETON HARRIS, Chief Justice. Kathy Johnson, Administratrix of the Estate of her husband, Ben Johnson, instituted suit in the Pulaski County Circuit Court against

Arkansas Kraft Corporation, hereafter called Kraft, appellant herein, alleging that on September 1, 1970, the deceased, an employee of Chicago, Rock Island & Pacific Railroad Company, hereafter called Railroad, was killed when he was struck by pulpwood logs which fell from a railroad car; further, that the pulpwood had been loaded on the train by Kraft employees who had been negligent in the loading operation in such a manner that the pulpwood had fallen from the car. Recovery was sought on behalf of the estate, appellee's widow, and one minor child, in the total amount of $601,936.32. Kraft answered, subsequently amending its answer, denying each and every material allegation except that the accident did occur, pleaded that the injuries resulting in Johnson's death were caused or contributed to by his own negligence and that, in the alternative, the injuries resulted from a risk or risks which Johnson assumed. On trial, the jury rendered a judgment in the amount of $35,000 for the widow, $45,000 for the daughter, and $1,960.00 for the estate, a total of $81,960.00. The court entered a total judgment for $81,936.32,[1] and from such judgment comes this appeal. For reversal, four points are alleged which we proceed to discuss in the order listed.

"I.

THE COURT ERRED IN ALLOWING PLAINTIFF TO ADVISE THE JURY THAT A PRIOR SETTLEMENT HAD BEEN REACHED BETWEEN PLAINTIFF AND A THIRD PARTY, CHICAGO ROCK-ISLAND & PACIFIC RAILROAD COMPANY."

Since Ben Johnson was an employee of a railroad company, his personal representative had a cause of action against the railroad under the Federal Employer's Liability Act for negligence resulting in the death of the decedent. Such an action was filed (prior to the litigation now before us) in Federal District Court under which an FELA recovery was sought. However, prior to trial of that case,

---

[1] It was agreed that the jury's award on behalf of the estate was in excess of the damages proven and the amount was reduced by agreement.

appellee and the railroad settled for a total of $79,500.00. Prior to trial of the instant litigation, counsel for appellee disclosed an intention to inform the jury that the appellee had filed a separate suit against the railroad which had been settled for $79,500.00, and this was done over the objections of the appellant.[2] It is argued that the court's action in permitting the amount of this settlement to be disclosed to the jury constituted error, appellant asserting that the proper procedure was for the jury not to be apprised of the settlement, but instead, the court should credit the amount of any judgment against Kraft with the settlement amount. As authority for this position, Kraft relies upon *Walton v. Tull*, 234 Ark. 882, 356 S.W. 2d 20. There, Tull had sued several alleged tortfeasors for personal injuries arising out of an automobile accident but prior to trial, Tull settled his cause with one of the defendants. Subsequently, one of the defendants attempted to introduce the settlement to the jury which the trial court did not permit. On appeal, we upheld this action pointing out that though in *Giem v. Williams*, 215 Ark. 705, 222 S.W. 2d 800, the payment by one joint tortfeasor was considered by the jury, we did not hold that procedure to be proper in all cases. In affirming, we stated:

"The fact of settlement might have had some slight

---

[2]From the record:
"ATTORNEY FOR DEFENDANT:
In Chambers and prior to the commencement of the trial, the defendant objects generally and specifically to any and all statements, testimony and references to any settlement between plaintiff and the deceased employer railroad company arising out of the Federal Court lawsuit brought about as a result of the accident giving rise to this litigation for the reason that same would be prejudicial to the defendant's position in this cause.
"ATTORNEY FOR PLAINTIFF:
The plaintiff would like to have the record reflect that its intentions to announce the settlement and the amount of it to the jury is in response to defendant's contention that it is entitled to a credit for the settlement.
"ATTORNEY FOR DEFENDANT:
I would contend the proper handling would be for no mention to be made with respect to settlement and the Trial Court to simply credit it on any amount returned by the jury.
"THE COURT:
Objection overruled."

bearing upon Tull's credibility, but this reason for admitting the proof is outweighed by the arguments for its exclusion. The evidence would have informed the jury that one of the defendants had admitted liability and might also have been used as a basis for an argument that Tull had accepted the amounts of the settlement as fair compensation for his injuries. The Uniform Contribution Among Tortfeasors Act contemplates that each tortfeasor will be credited with amounts paid by other joint tortfeasors, Ark. Stat. 34-1004, but the statute is silent about how the matter is to be handled."

In *Giem,* mentioned in the previous citation, the administratrix brought suit against Giem, a general contractor, and suit was also filed against a subcontractor. The subcontractor (Tune) was dismissed as a defendant prior to the trial following his payment to the administratrix of the sum of $4,000 in return for a covenant not to sue. At the trial, Giem introduced into evidence the settlement between the subcontractor and the plaintiff. When the jury awarded the plaintiff a verdict in the amount of $8,500, Giem moved the court to credit the verdict with the $4,000 which the subcontractor had paid in settlement. The motion was denied and on appeal we affirmed, stating:

"Appellants had the right, under Section 34-1007, Ark. Stats. of 1947, to make Tune a third-party defendant, even after the appellee had dismissed as to him. But, instead of availing themselves of the said section, appellants evidently decided to proceed under Section 34-1004, Ark. Stats. of 1947, which reads: 'Release of one tortfeasor — effect on injured person's claim — A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.'

"At all events, as between appellants and appellee, appellants in the trial of the case before the jury obtained the full benefit of the above-quoted section by introducing into evidence, proof as to the amount of money that appellee received from Tune. Certainly, in such circumstances, appellants were not entitled to have the court — after the verdict — make the allowance again."

In *Woodard* v. *Holliday*, 235 Ark. 744, 361 S.W. 2d 744, West Bend, a joint tortfeasor, settled with the plaintiffs and a covenant not to sue was executed. On appeal, this court cited the provisions of Section 4 of the Uniform Contribution Among Tortfeasors Act, Ark. Stat. Ann. § 34-1004 (Repl. 1962), and then stated:

"This statute was approved by this court in *Giem* v. *Williams*, 215 Ark. 705, 222 S.W. 2d 800. In that case evidence as to the amount paid by one of the joint tortfeasors was introduced into evidence at the trial of the other tortfeasor. *After the verdict, the court correctly refused to reduce the amount of the verdict by the amount paid by the other tortfeasor prior to trial, since the jury was advised of the settlement and the amount prior to reaching its verdict.* [Our emphasis]. As the court said in that opinion:

'At all events, as between appellants and appellee, appellants in the trial of the case before the jury obtained the full benefit of the above-quoted section by introducing into evidence, proof as to the amount of money that appellee received from Tune. Certainly, in such circumstances, appellants were not entitled to have the court — after the verdict — make the allowance *again.*' (Emphasis ours.)

"In the instant case, the trial court refused appellant permission to introduce evidence of West Bend's settlement payment to appellees, but after verdict the trial court, under the theory that the law of joint tortfeasors applied, correctly credited the judgment with the $5,000 payment, *since the jury had no*

*knowledge of the West Bend settlement and therefore assessed the total damages of appellees."* [Our emphasis].

Appellant argues that *Walton* v. *Tull, supra,* prohibits the disclosure of the Rock Island settlement to the jury, apparently contending that since *Walton* was handed down subsequent to *Giem,* the latter is controlling. We do not agree. In the first place, there is nothing in *Walton* which overrules *Giem.* The court only commented that we did not hold that the *Giem* procedure was proper in all cases. *Walton* v. *Tull, supra,* was handed down on March 26, 1962 (rehearing denied April 30, 1962), and the fact that *Giem* was not overruled is emphasized by *Woodard* (handed down on November 19, 1962) in the just quoted language from that case. Furthermore, in *Bailey* v. *Stewart,* 236 Ark. 80, 364 S.W. 2d 662 (February 11, 1963), the language of the opinion clearly denotes that *Giem* has not been overruled, though the point there in issue was not affected by either *Giem* or *Walton.* We said:

> "The *Giem* case and the *Walton* case, relied upon by the trial judge, do not quite reach the point at issue. In the former we held that where the jury had been informed of a compromise payment made by another tortfeasor its amount should not have been subtracted from the verdict, as the jury had already taken it into consideration. In the *Walton* case we indicated (and later declared, after the trial below, in *Woodard* v. *Holliday,* 235 Ark. 744, 361 S.W. 2d 744) that such a deduction would be proper where the jury had not been told about the settlement made by the other tortfeasor."

Actually, this court has never reversed a judgment on either basis, i.e., the jury was told, or not told, about settlement with another tortfeasor.

Appellant asserts that it was particularly prejudiced because, when the settlement was disclosed, it tended to negate in the jury's mind the validity of two defenses it had raised, *viz.,* contributory negligence and assumption of risk. Appellant says that the jury, having been apprised

that the railroad had admitted liability, obviously concluded that the railroad did not believe the deceased was contributorily negligent or had assumed the risk of riding next to an overloaded freight car. It is alleged that the defense of assumption of risk was particularly weakened since under FELA (45 USC Section 54), the defense of assumption of risk was not available to the railroad; also, that under FELA, contributory negligence does not bar recovery of one who is more than 50% negligent but only diminishes it in proportion to his negligence. We are not impressed with this argument. The comment under Arkansas Model Jury Instructions - Civil - § 1921 (1974) points out that the joinder of an FELA action with a common law action has been repeatedly sustained. Kraft offered instructions as to the railroad's duty of care which were given by the court, and there was nothing to prevent additional instructions advising the jury of the law under FELA, had it so desired. Appellant was not deprived of these defenses and it certainly cannot be assumed that the jury ignored the instructions on contributory negligence and assumption of risk.

On the whole, we fail to see how prejudice occurred. Let it be remembered that Kraft could have made the railroad a third party defendant as it was entitled to do even though appellee had settled with the railroad. This, Kraft chose not to do, but instead desired to follow the strategy that as long as the settlement was not in evidence, it could argue that the railroad was the negligent party in the case and should have been sued instead of appellant. However, with the settlement being shown, appellant was still in a position to argue that it was not liable for it could point out to the jury that the railroad had already admitted that it was responsible for Johnson's death; that it had paid $79,500 because it was liable, and certainly it could argue that the railroad would not have paid had some other company been the responsible party. In fact, this would seem to be a stronger argument than the argument appellant was deprived of making.

Be that as it may, comparatively speaking (as between appellant and appellee), the injustice to appellee would have been much more pronounced (than to appellant) had the jury

not received the information about the settlement, for if the jury had not been so informed after its verdict had been reached, appellant would have asked that the amount of settlement with the railroad be credited on the amount of the judgment obtained against it. Under *Woodard,* this would have been proper and appellee would have wound up with an approximate $500 judgment against Kraft (for herself and daughter), or a total judgment of $80,000. This certainly would have been more unjust to appellee than any prejudice claimed by appellant, for Johnson was a 25-year-old brakeman, with an excellent work record, who had just been promoted to conductor, and with a life expectancy of 44 years.

Mr. Joseph A. Krenz, Jr., an actuary, using a 5% interest rate, testified that, considering expected earnings per annum of $13,000 to $17,000, and considering contribution to his family each year in the amount of $9,000, the amount (present value) that would have been contributed to his family over the period of his life expectancy, would be $158,964.84. It is interesting to note that this amount is within less than $2,500 of the total amounts received by appellee from the railroad settlement and the judgment against Kraft, the latter judgment also including $1,936.82 for the estate. This seems to be a clear and decisive indication that the jury, in fixing damages against Kraft, took into full consideration the settlement with Rock Island.

Though not argued by appellant, it has been suggested in conference that the court did not specifically tell the jury that the plaintiff was only entitled to one recovery of total damages and that in reaching the determination of total damages, the jury should keep in mind the $79,500 settlement with the railroad, and that total damages would include this settlement figure. The short answer to this suggestion is that there is no contention by appellant that such an instruction should have been given,[3] or that any more comprehen-

---

[3]The court gave the following instruction:

"If you decide for the administration [rix] on the question of liability against Arkansas Kraft Corporation, you must fix the amount of money which will reasonably and fairly compensate the wife, child and estate for those elements of *damages which you find were proximately caused by the negligence of Arkansas Kraft Corporation.*" [Our emphasis].

sive wording should have been used when the jury was informed of the settlement. Nowhere in appellant's brief is such an argument presented. In other words, such a position was neither taken at the trial court level nor is it set forth here. No citation of authority is necessary in saying that, aside from jurisdiction, we do not reverse cases on theories not presented by appellant to either the trial court or this court. For that matter, the fact that appellant made no motion to credit the judgment for appellee with the amount of the railroad's settlement (see footnote 2) reveals Kraft knew the jury fully understood that any verdict reached for appellee should be in addition to the railroad compromise. Certainly, the motion would otherwise have been made.

Be that as it may, it is evident that the jury knew exactly the purpose of acquainting it with the railroad settlement.

Under the facts mentioned, considering the overall picture, we hold that no error was committed.

## II.

In making this argument, appellant assumes, for purposes of argument, that it was negligent in loading the railroad car by stacking the pulpwood above the bulkheads. It is then asserted that the act of the railroad, in accepting this car, constituted the efficient intervening cause of the decedent's death. The principal case relied upon is *Cowart, Administratrix* v. *Casey Jones Contractor, Inc.*, 250 Ark. 881, 467 S.W. 2d 710. There, an action for wrongful death was instituted by the widow of a deceased employee of Bechtel Corporation, a building contractor. Recovery was sought against Casey Jones Contractor, Inc., that company supplying heavy duty lifting cranes to contractors. It was asserted that the defendant company had leased a dangerous and defective crane to Bechtel, the crane not being equipped with certain safety devices designed to prevent the mechanism from spinning during lifting operations. The Bechtel employee was killed when such spinning occurred, knocking him from the crane to the ground. We held that the actions of decedent's employer (Bechtel) constituted an efficient, independent, and intervening proximate cause which superseded or broke the

causal connection of the negligence, if any, of appellee. However, the facts there were far different from those at hand. The opinion sets out those facts.

> "In the case at bar it is undisputed that the crane had been on the job site and out of the appellee lessor's control for at least three to four weeks; that the crane was assembled on the job site and operated by the decedent's employer, during which time the appellee exercised no control over the crane's operation. Further, that decedent's employer was aware during this three to four weeks of use that the two safety devices were not on this crane; that, knowing this, decedent's employer directed him to work with or about this crane in the lifting of heavy structural steel which, according to the record, is the only time during the three to four weeks it had been so used; and that decedent's employer admitted that it was customary, in the absence of these safety devices, to take 'the back lay out of the cable' before it is sent up."

In the case before us, the railroad car had only been in possession of the railroad for a few hours, and there was no proof that employees of the railroad were aware, before the accident, that the car was improperly loaded.

It appears to us that if the car was negligently loaded by Kraft, the railroad's negligence was its failure to discover the negligence of Kraft. We like the reasoning of the Supreme Court of Ohio in *Pennsylvania Railroad Company* v. *Snyder*, 45 N.E. 559, where a switchman (Jesse Snyder) was an employee for the Lake Shore and Michigan Southern Railway Company. Snyder was injured when he fell from a boxcar and it developed that the handhold on the ladder which was attached to the side of the car was missing. Because of this defect, he lost his balance and fell. This railway car had been furnished to Lake Shore by the Pennsylvania Railroad Company, the owner of the car. The Pennsylvania Railroad appealed a judgment against it obtained by Snyder, contending that its negligence in furnishing a defective car was not the proximate cause of Snyder's injury for the reason that the causal connection was broken by the interven-

ing negligence of Lake Shore in failing to inspect the car and discover the defect. On appeal, the court said that Lake Shore Railroad was clearly negligent, but it then continued as follows:

> "But it does not follow that, because the Lake Shore Company is liable for the damages sustained by the plaintiff below, the plaintiff in error may not be also. To relieve the latter from the consequences of its negligence, it is not enough that the act of the Lake Shore Company was nearest in the order of events to the injury, nor that, without it, the injury would not have occurred. To have that effect it must have been the efficient, independent, and self-producing cause, disconnected from the negligence of the plaintiff in error. The causal connection is not broken 'if the intervening event is one which might in the natural course of things be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.' It is not essential to the liability of the plaintiff in error that its negligence should be the sole cause of the injury; but if that result was produced by the negligence of both companies, each contributing a necessary condition to the result, either or both might be held responsible at the election of the party injured. Neither could claim exoneration on account of the fault of the other. The negligence of the plaintiff in error was undoubtedly the primary cause. If it had not furnished the defective car, the injury could not have occurred."

An instruction on intervening cause was properly given to the jury, and certainly we cannot say, as a matter of law, that there was no jury question on this issue.

### III.

It is contended that the court should have directed a verdict on grounds of the deceased's contributory negligence and assumption of risk. It is argued that the condition of the flat car (loaded with pulpwood), which contained two vertical bulkheads, one at each end of the car, was such that Johnson either knew of the height of the pulpwood in relation to the

bulkheads, or should have known. All of the evidence in the case was circumstantial evidence, as will be discussed under Point IV, and while, pershaps, there were some circumstances that favor appellant's position, they certainly were not such as to justify a directed verdict. Let it be remembered that the defense of contributory negligence, like assumption of risk, is an affirmative defense, and the burden of proof is upon the defendant. *Aluminum Company of North America* v. *Ramsey*, 89 Ark. 522, 117 S.W. 568. Also, as stated in *McDonald* v. *Hickman*, 252 Ark. 300, 478 S.W. 2d 753,' "It is not our province to compare the negligence of the litigants when fair-minded men might reach different conclusions in the matter."

As to assumption of risk, we find no evidence in the record that Johnson was actually aware of the dangerous condition of the cars, and without such knowledge, the doctrine cannot apply. In *McDonald* v. *Hickman*, *supra*, this court said:

> "Assumption of risk, a harsh doctrine, depends upon actual knowledge and appreciation of the danger. As Prosser puts it: "Knowledge of the risk is the watchword of assumption of risk" Under ordinary circumstances the plaintiff will not be taken to to assume any risk of either activities or conditions of which he is ignorant. Furthermore, he must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself.' Prosser on Torts, § 68 (4th ed., 1971). See also the Restatement of Torts (2d), § 496 D (1965), where it is stated: 'The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence.' "

The court instructed the jury on comparative negligence and assumption of risk and these issues were accordingly before that body in its deliberations. We cannot agree that a directed verdict should have been granted on the basis of these defenses.

## IV.

Finally, it is contended that there was no substantial

evidence that Johnson's death was caused by any act of appellant, and it is asserted that appellee's case rests entirely upon conjecture and speculation. It is true that no one saw a falling log strike Johnson, nor that anyone observed him fall from the train. It is asserted that though there was evidence that there was a pile of pulpwood in the area where drag marks left by the deceased began (Johnson was dragged approximately 423 ft. after hitting the ground), this condition was commonly found as a result of the switching operations of the various trains using the depot and there was no direct proof that these logs had fallen from this particular train; furthermore, that during the backing up of the train (while Johnson was still alive) some pulpwood had fallen from one of the cars in the same area where the fallen pulpwood was found.

Of course, as pointed out in *Arkmo Lumber Company* v. *Luckett*, 201 Ark. 140, 143 S.W. 2d 1107, it is not necessary that an injury to established by direct proof, but if the circumstances are such to justify an inference on the part of the jury that the negligent conditions alleged produced the injury complained of, recovery can be had. We said, quoting an earlier case,[4] "It will be sufficient if the facts proved are of such a nature and are so connected and related to each other that the conclusion therefrom may be fairly inferred." There was evidence that Johnson fell from the stirrup located on the right front end of the air dump car on which he was riding, and evidence that the logs in the car directly in front of the air dump car were loaded well above the bulkhead.

Mike Lanahan, Manager of Safety for Rock Island Railroad, went to the scene of the accident within two hours and conducted an investigation. He testified that from the point of the first drag marks to the point where Johnson's body was found was approximately 423 ft.; that he saw a number of logs (pulpwood) on the right-of-way to the west of the area where the drag marks started. The witness stated that the center of the distribution of the area of the logs was between 12 ft. and 20 ft. west of the first sign of Johnson's body being dragged. The next day, Lanahan returned to the scene and examined the car from which the pulpwood had

[4]*St. Louis-San Francisco Ry. Co.* v. *Bishop*, 182 Ark. 763, 33 S.W. 2d 383.

allegedly fallen, the car being in the same location and in the same condition (except for the surfaces at the top of the bulkhead) that it was on the previous day immediately following the accident. "The day before when I climbed up on the car I noticed, oh, six or eight fragments of loose bark lying on top of that horizontal steel sheet next to the wood liner and on the top of the steel braces you see going to the right of the picture." Lanahan testified that if the bark had gotten on the bulkhead at the time the car was being loaded, it would have blown off prior to the accident due to the wind or vibrations from the movement of the train, and that such bark was gone the day after the accident. Lanahan said that the logs in the pulpwood car directly in front of the air dump car were loaded considerably above the bulkhead, and photographic exhibits likewise reveal that the pulpwood on this car was stacked above the bulkhead; it would appear that these logs would have been directly above Johnson who, as stated, was riding on the stirrup. Lanahan stated that in his nine years of investigating accidents, he had never seen a cluster of logs (approximately 13) deposited on the railroad right-of-way like the one under discussion, and he was very positive that the car was overloaded. Medical evidence reflected that a wound on the right side of decedent's head was consistent with his having been struck by a log, although it could also have occurred from the head bumping the crossties. In *Hawkins* v. *Missouri-Pacific Railroad Company, Thompson, Trustee,* 217 Ark. 42, 228 S.W. 2d 642, this court said:

> "A directed verdict for the defendant is proper only when there is no substantial evidence from which the jurors as reasonable men could possibly find the issues for the plaintiff. In such circumstances the trial judge must give to the plaintiff's evidence its highest probative value, taking into account all reasonable inferences that may sensibly be deduced from it, and may grant the motion only if the evidence viewed in that light would be so insubstantial as to require him to set aside a verdict for the plaintiff should such a verdict be returned by the jury."

Certainly, in line with *Hawkins*, we cannot say that this evidence was so insubstantial that reasonable men could not

644

possibly find the issues for the plaintiff. When all the circumstances are viewed, and giving appellee's evidence its highest probative value, we think, and hold that a jury question was presented.

Affirmed.

BYRD, J., not participating.